## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PATRICK CORNWALL** *Plaintiff,* <br><br> **v.** <br><br> **DELAWARE COUNTY,** ***et al.*** *Defendants.* | **CIVIL ACTION NO. 21-2456** |

### MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT [ECF 94]

**BAYLSON, J.**                                                                        **June 11, 2026**

### I.    INTRODUCTION

Plaintiff Patrick Cornwall ("Plaintiff") alleges that, while incarcerated at SCI Phoenix, a correctional facility, he was denied adequate medical care.  Second Amended Complaint ¶ 27–47 ("SAC," ECF 58).  Pursuant to these allegations, Plaintiff asserts constitutional violations under § 1983 against Defendants Oswaldo Tagle Manrique, CRNP, Joseph Walsh, PA-C, Jeanne DeFrangesco, CRNP, Dr. Saeed Bazel, Stephen Kaminsky, PA-C, Anna Wakeman, CRNP, and Paula Purnavel, CRNP, ("SCIP Defendants").  Before the Court is SCIP Defendants' Motion for Summary Judgement and Memorandum of Law ("Motion," ECF Nos. 94, 97), Plaintiff's Opposition ("Opp'n," ECF 100), and SCIP Defendants' Reply (ECF 103).  For the following reasons, the Motion is **GRANTED**.

### II.    FACTUAL BACKGROUND

Defendants Tagle Manrique, Walsh, Defrangesco, Bazel, Kaminsky, Wakeman, and Purnavel administered health care at SCI-Phoenix when Plaintiff Cornwall was incarcerated there.  SAC ¶ 29–47.  Plaintiff initiated this lawsuit on May 28, 2021.  ECF 1.  In the operative Second Amended Complaint, Plaintiff claims that between March 2020 and October 2020, the

1

SCIP Defendants, individually and in their official capacities, acted with deliberate indifference to his serious medical needs, including a right-hand fracture, severe migraines, a seizure disorder, a history of melanoma requiring sunblock, and mouth ulcers/dry mouth.  SAC ¶ 29–47.

The following facts are undisputed.  Prior to his transfer to SCI-Phoenix, Plaintiff was incarcerated at George W. Hill Correctional Facility where he had a documented history of epilepsy, right-shoulder issues, traumatic brain injury, recurring mouth infections, and melanoma removal.  Defendants' Statement of Facts ("SOF," ECF 98) ¶¶ 18, 20.  Upon intake at SCI–Phoenix on March 13, 2020, medical staff documented these conditions and performed numerous evaluations and renewals of medications.  Id. ¶¶ 21–37, 40–75, 77–113.

### A.  Plaintiff's Right-Hand Fracture

On May 23, 2020, Plaintiff injured his right hand.  SOF ¶ 7.[1]  Defendant and Physician Assistant ("PA") Tagle Manrique evaluated Plaintiff on May 26, 2020.  Id. ¶ 37.  PA Tagle Manrique ordered an X-ray, Motrin, ice packs, and Band-Aids.  Id.  On May 29, 2020, Plaintiff underwent an X-ray, and non-party Dr. Scott Logan determined that Plaintiff had a boxer's fracture of the fifth metacarpal with mild angulation.  Id. ¶ 38.

Defendant and PA Joseph Walsh regularly performed splinting and casting at SCI-Phoenix.  Id. ¶ 223.  Plaintiff testified at his deposition that he could not recall whether PA Tagle Manrique or PA Walsh set his hand.  Id. ¶ 122.  However, the parties appear to agree that PA Walsh set Plaintiff's hand in a cast on May 29, following the X-ray.  Opp'n at 2.  PA Walsh consulted with another PA about setting the bone before casting it.  SOF ¶ 232.  The cast was to stay on and dry for four to six weeks.  Id. ¶ 39.  PA Walsh ordered follow up x-rays for June 8th

---

[1] Plaintiff testified at this deposition that he fell on Memorial Day, but did not receive treatment until six days later. Id. ¶ 117.  However, Plaintiff also testified that he immediately reported his injury and was seen by a nurse later that day, who ordered him an X-ray.  Id. ¶ 118–19.

and 10th. Id. On June 26, 2020, Plaintiff underwent additional x-rays reviewed by Dr. Logan and PA Walsh. Id. ¶ 46–47. They scheduled his cast removal and follow up x-rays for June 28, 2020. Id. On June 29, PA Walsh removed Plaintiff's cast and provided him with a wrist splint. Id. ¶ 50. Plaintiff underwent an x-ray where Dr. Logan observed a "subacute fracture without substantial change in alignment and in the process of healing." Id. ¶ 52. PA Walsh noted the following:

> "[I]t was now just over 4 weeks from the boxer's fracture right fifth metacarpal. Cast cutter was used to remove cast and re-X-ray on wet reading shows some callus formation at right 2nd distal 5th metacarpal, with partial angulation. Significant reduction in pain. Now only mild tenderness with abduction of fifth finger against resistance. No STS. He is able to clench his fist with all fingers and thumb. Will continue to treat by wearing R wrist splint and buddy tape 4th and 5th fingers, will repeat X-ray in 4 weeks. A: Dx 4 ½ weeks status post. Healing fracture distal head of Rt fifth metacarpal. Cast removed. P: Wrist splint with buddy tape right 4th and 5th fingers. Will re-X-ray in 4 weeks."

Id. ¶ 53. PA Walsh met with Plaintiff again on July 1, 2020 to review x-rays. Id. ¶ 55. On July 6, 2020, Plaintiff received another round of x-rays on his hand, which Dr. Logan interpreted and compared with the June 29 film. Id. ¶ 57. Dr. Logan observed "no change in alignment" and observed a "subacute boxer type fracture deformity of the fifth metacarpal neck." Id. Dr. Logan ordered a follow up radiograph, MRI or bone scan in 10 to 14 days if patient has persistent pain. Id.

On July 24, 2020, Plaintiff was seen by Defendant and PA Stephen Kaminsky following complaints of pain and swelling from his fractured hand. Id. ¶ 65. PA Kaminsky noted he "will request ortho hand consult." Id. On July 30, 2020, PA Kaminsky prepared a request for an orthopedic consultation, which was approved by non-party Dr. Leclerc on July 31, 2020. Id. ¶ 66.

On August 18, 2020, non-party clinical coordinator Kathleen Levey made a note that she had requested the x-ray films and would schedule the consultation once she received the films.

3

Id. ¶ 72.  On October 14, 2020, Plaintiff had a pre-release Covid test.  Id. ¶ 84.  On October 19, 2020, clinical coordinator Levy noted that the ortho consult that was scheduled for October 30, 2020, would be rescheduled to November 6, 2020, due to trip restrictions.  Id. ¶ 85.  On October 23, 2020, clinical coordinator Levey canceled Plaintiff's consultations because he was paroled.  Id. ¶ 88.  However, Plaintiff was reincarcerated from October 23, 2020, through November 24, 2020, for an undisclosed reason.  Id. ¶ 88 n.5.  The medical screening form for his reincarceration noted Plaintiff reported 0/10 pain and limited range of motion in his right shoulder and right ring finger.  Id. ¶ 89.  He received a special needs pass to use a splint on his right hand and a lower bunk assignment.  Id. ¶ 91.

On January 21, 2021, several weeks after his release, Plaintiff underwent an x-ray of his right hand, ordered by non-party Dr. Thomas Jacobs.  Id. ¶ 105.  Dr. Jacobs' impression was that he had an "old fracture deformity 5th metacarpal no acute traumatic abnormality interphalangeal joint degenerative changes."  Id.  Plaintiff submitted an expert report by Dr. Robert Sing, written on April 23, 2023.  Id. ¶ 255.  Dr Sing noted that Plaintiff had continuing right hand pain and deformity of his right pinky finger, but did not opine as to whether that was caused by the casting and splinting process or anything done by medical providers in the prison.  Id. ¶ 257; ECF 99-8, Ex. H.

### B.  Plaintiff's Additional Medical Conditions

Plaintiff faced a number of additional medical conditions while incarcerated.  Upon Plaintiff's transfer to SCI-Phoenix, his medical history included: epilepsy, right shoulder osteoarthritis, motor vehicle accident in 1997 with traumatic brain injury, and recurring mouth infection.  SOF ¶ 20.  He had a history of heroin and "crack" cocaine use and suffered from anxiety and depression.  Id.  His medications included Phenobarbital, Remeron, Trazodone,

Topamax, Zantac, Mobic, Wellbutrin, and Multivitamins.  Id.  On March 13, 2020, a non-party nurse conducted a new reception screening at SCI-Phoenix noting Plaintiff reported a melanoma had been removed from his left shoulder and that he stated he needs surgery on his right shoulder tendon.  Id. ¶ 21.  Plaintiff had his first dental visit at SCI-Phoenix on March 16, 2020.  Id. ¶ 22.

On March 18, 2020, he was seen by Defendant CRNP Anna Wakeman for a sick call due to pain in his right shoulder from a recent injury as well as low back pain that traveled down his legs causing numbness.  Id. ¶ 23.  Defendant Wakeman prescribed Robaxin/Motrin and made a note to consider physical therapy.  Id.

On March 22, 2020, a non-party nurse practitioner conducted an intake examination noting his general health history, including that he reported a right shoulder and Labrum tear.  Id. ¶ 24.  On March 24, 2020, Plaintiff was seen on a sick call by Defendant CRNP Paula Purnavel.  Id. ¶ 25.  He complained of jock itch, foot fungus, and whole-body eczema.  Id.  CRNP Purnavel prescribed Triamcinolone cream for his rash, Aquaphor ointment, and Ketoconazole for the inguinal and feet areas, and instructed Plaintiff to avoid moisture.  Id.  On March 31, 2020, Defendant PA Stephen Kaminsky noted Plaintiff's meds needed renewal via the renewal queue.  Id. ¶ 26.  On April 7, 2020, PA Kaminsky ordered a phenobarbital level to test the level of phenobarbital in Plaintiff's system.  Id. ¶ 27.  April 8, 2020, Plaintiff saw PA Kaminsky for a sick call, complaining his tongue felt like it was burning and PA Kaminsky decided to increase omeprazole for 30 days and reevaluate.  Id. ¶ 28.

On April 14, 2020, Plaintiff saw PA Tagle Manrique and requested a renewal of Motrin for his right shoulder pain, which PA Tagle Manrique provided.  Id. ¶ 30.

On April 28, 2020, Plaintiff saw CRNP Purnavel for a sick call.  Id. ¶ 31.  He complained of mouth sores, and CRNP Purnavel prescribed Biotene mouth wash and short term prednisone and to follow up on sick call if no improvement.  Id.

On May 1, 2020, Defendant CRNP Jeanne DeFrangesco renewed Plaintiff's Motrin for shoulder pain and his Prilosec prescriptions.  Id. ¶ 32.

On May 7, 2020, Plaintiff had a dentist appointment with non-party dentist Ron Burkholder, DDS.  Id. ¶ 33.  On May 15, 2020, Plaintiff was seen for a sick call by CRNP DeFrangesco, who noted that Plaintiff reported the Biotene rinse was helping relieve the canker sores in his mouth.  Id. ¶ 34.  She reordered his Biotene.  Id.

On May 17, 2020, Plaintiff saw a non-party nurse practitioner for a sick call regarding his history of melanoma removed from his left shoulder in 2019 and notes he was scheduled for a full body check in June, prior to his incarceration.  Id. ¶ 35.  The nurse practitioner's chart reflects that she wanted to follow up in a month and would request records and ask for MD follow up to consider a dermatology referral after the records were received.  Id.

On May 20, 2020, Plaintiff had a sick call with CRNP DeFrangesco, complaining of chronic pain in his right shoulder unrelieved by Motrin, as well as frequent urination.  Id. ¶ 36.  CRNP DeFrangesco renewed the Motrin and ordered a UTI test as well as a trial of Flomax.  Id. On June 15, 2020, Plaintiff saw non-party Dr. Donald DeSantis to follow up about frequent migraine headaches and problems with urination.  Id. ¶ 40.  The following day, Dr. DeSantis wrote a consultation request for an off-site ultrasound of the rectum for sizing prostate, noting he has been on 0.4 mg of Flomax for one month and had just increased the dose and ordered a Prostate-Specific Antigen level test.  Id. ¶ 41.  The request was approved by non-party Dr. Stephen Wiener on June 22, 2020.  Id.

6

On June 17, 2020, Plaintiff saw PA Tagle Manrique for an administrative exam where PA Tagle Manrique noted Plaintiff's history of seizures, chronic shoulder pain, migraines, and removal of melanoma in 2019 and noted Plaintiff was "medically stable." Id. ¶ 42.

On June 19, 2020, Plaintiff saw PA Tagle Manrique for a sick call complaining that he had not received one of his migraine medications and his chronic shoulder pain remained a problem. Id. ¶ 43. PA Tagle Manrique noted that "Imitrex 25 mg [twice per day] was prescribed … by another provider but not approved. Will re-prescribed Imitrex 25 mg … pending approval. Renewed Motrin prn for chronic R shoulder pain. Requested MRI report of R shoulder, authorization signed and submitted." Id. On June 24, 2020, non-party LPN Samantha Thomas noted he was given Imitrex. Id. ¶ 44.

On June 25, 2020, Plaintiff was seen by CRNP DeFrangesco and asked for sunblock due to his history of skin cancer. Id. ¶ 45. CRNP DeFrangesco noted she was unable to find documentation of skin cancer in county transfer records and encouraged Plaintiff to purchase sunblock from the commissary. Id. Plaintiff ultimately purchased sunblock from the commissary. Id. ¶¶ 133–34.

On June 27, 2020, Plaintiff saw a non-party nurse for a migraine and stated he had been asking for his Imitrex for more than 24 hours. Id. ¶ 49. The nurse administered Imitrex. Id.

Plaintiff was seen by dental on July 1, 2020. Id. ¶ 54.

On July 19, 2020, Plaintiff complained to a non-party nurse that he was not receiving his Imitrex. Id. ¶ 62. She told him she did not have it right now and it was sent to the pharmacy for refill. Id. On July 22, 2020, CRNP Wakeman saw him for a sick call because he hadn't had access to his headache medication. Id. ¶ 63. CRNP Wakeman changed the order to another pharmacy. Id.

7

At his deposition, Plaintiff explained that he "thought [the staff was] being mean to [him] and just denying [him] the medication," but he later realized that he was only given the pill for seven out of 21 days to avoid his body getting used to the medication.  Id. ¶¶ 131–32.  He testified that he does not believe any individual defendant maliciously withheld medication for his migraines.  Id. ¶ 130; see also Opp'n Resp. to SOF at 7, ¶ 130.

On July 22, 2020, Plaintiff was seen by Defendant Dr. Bazel for his prostate and skin conditions.  Id. ¶ 64.  Dr. Bazel noted a small lesion on his face to the right of his nose and normal urine test.  Id.  Dr. Bazel wrote that Plaintiff should continue his present medications and noted he would consider a dermatology consult and skin lesion removal after checking with non-party Dr. Wiener.  Id.

On August 3, 2020, Plaintiff was seen for a sick call by CRNP Purnavel complaining of shoulder pain.  Id. ¶ 67.  An MRI showed rotator cuff lesions, and she also observed oral ulcerations.  Id.  CRNP Purnavel prescribed Pamelor increased to 50 mg, Biotene for oral lesions, Diflucan for 7 days, and follow up on sick call if no improvement.  Id.  She also noted they were waiting on his ortho consult for recommendations.  Id.

On August 12, 2020, Plaintiff saw CRNP Wakeman for a sick call due to painful lesions under his tongue.  Id. ¶ 68.  CRNP Wakeman noted his oral candidiasis had resolved but he should continue Biotene for the lesions that persisted on his tongue and she indicated following up with Dr. Wiener about those lesions.  Id.  On August 17, 2020, Plaintiff saw CRNP DeFrangesco for a sick call to request two bottles per month of Biotene instead of one.  Id. ¶ 70.  She changed his order to two bottles per month.  Id.

On August 22, 2020, Plaintiff saw a non-party nurse practitioner about the spot on his face and his history of melanoma.  Id. ¶ 73.  The nurse practitioner noted she previously

requested his dermatology records and would request them again, as well as request a biopsy and telemed dermatology.  Id.

On August 25, 2020, Dr. Bazel prepared a consult request for dermatologic telemed, noting he was overdue for a scheduled skin consult.  Id. ¶ 74.  The request included a note that the consultation was canceled in January of 2021 by a non-party doctor due to patient release from prison.  Id.

On August 31, 2020, he saw CRNP DeFrangesco for a sick call to renew his Motrin, which he received.  Id. ¶ 77.

On September 17, 2020, non-party clinical coordinator Levey noted a September 16 telederm appointment had to be rescheduled to September 28 due to lack of staff for telemed.  Id. ¶ 78.

On September 23, 2020, Plaintiff was seen by dental.  Id. ¶ 79.

On September 25, 2020, coordinator Levey noted the September 28 telederm appointment had to be rescheduled.  Id. ¶ 80.  On October 2, 2020, she noted that the October 9 scheduled date for the telederm had to be canceled due to a Covid lockdown, but she would reschedule when it was lifted.  Id. ¶ 82.  On October 14, 2020, Plaintiff had a pre-release Covid test.  Id. ¶ 84.  On October 23, 2020, coordinator Levey resolved the consultations she had been trying to schedule with a note that Plaintiff was paroled.  Id. ¶ 88.  However, Plaintiff was reincarcerated from October 23, 2020, to November 24, 2020, for undisclosed reasons.  Id. ¶ 88 n. 5.  On October 24, 2020, prison officials engaged in a use of force with Plaintiff and Plaintiff presented with a small abrasion apparent on his left hand.  Id. ¶ 91.

9

On October 26, 2020, Plaintiff had a sick call with a non-party nurse and became belligerent when she said she would check about his medication.  Id. ¶ 93.  After cursing at the nurse, he was told to leave.  Id.

On November 2 and 3, 2020, Plaintiff was seen for sick calls related to foot fungus and right shoulder pain, and he was prescribed ibuprofen, analgesic balm, and muscle rub.  Id. ¶¶ 94–95.

On November 6, 2020, Plaintiff was seen for a nursing assessment requested by the warden due to a phone call indicating possible drug use.  Id. ¶ 96.  Plaintiff tested positive for Fentanyl and K2.  Id.  On November 7, 2020, Plaintiff was seen for a psychiatric consult.  Id. ¶ 97. On November 14, 2020, Plaintiff requested Biotene and a refill of his antifungal cream, and on November 15, 2020, he signed a document accepting terms of keeping Biotene on his person, under the instruction to use it only as prescribed.  Id. ¶¶ 100–01.

After Plaintiff was released from prison, he saw non-party Dr. Thieu at Innovative Dermatology on November 30, 2020, for a skin exam.  Id. ¶ 102.  Plaintiff underwent multiple biopsies, which did not test positive for carcinoma, or other cancerous tissue.  Id.  On July 30, 2021, Plaintiff saw Dr. Thieu again for a full body skin examination.  Id. ¶ 107.  He underwent multiple biopsies, and a biopsy of his left medial superior chest showed squamous cell carcinoma in-situ, early lesion.  Id.

After Plaintiff was released, he also went to the emergency room at a hospital in Delaware County on December 10, 2020, after falling at Giant Grocery Store.  Id. ¶ 103.  He acknowledged smoking cigarettes and daily drug/cocaine use.  Id.  X-rays of his head, spine, and knees showed no acute injury and his knee was wrapped in an ACE bandage.  Id.

### III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

### IV.   DISCUSSION

Plaintiff alleges the SCIP Defendants have violated his Eighth Amendment rights pursuant to the cause of action available in 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United

11

States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). There is no dispute that the SCIP Defendants are state actors.

### A. General Principles

As a general matter, failure to provide adequate medical treatment violates the Eighth Amendment only when it results from "deliberate indifference to a prisoner's serious illness or injury." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a cognizable Eighth Amendment claim under § 1983, the Plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d. Cir. 2003). See also Brown v. Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) (holding that a doctor exercising professional judgment does not violate a prisoner's constitutional rights). A medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (citation omitted).

Determining whether someone acted with deliberate indifference is a subjective inquiry and acting with deliberate indifference means the actor consciously disregarded a serious risk to the plaintiff's health or safety. See Wilson, 501 U.S. at 298–99. To be found liable for deliberate indifference, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Deliberate indifference requires more than negligence or medical malpractice." Charleston v. Corizon Health, Inc., No. CV 17-3039, 2018 WL 1757606, *11 (E.D. Pa. Apr. 12, 2018) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.

12

1999)).  A "'mere disagreement as to the proper medical treatment' . . . does not 'support a claim of an eighth amendment violation.'"  Pearson v. Prison Health Serv., 850 F.3d 526, 543 (3d Cir. 2017) (quoting Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)).  Plaintiff does not need to go so far as to show "acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  Id. at 835.  "[P]rison officials are afforded considerable latitude in the diagnosis and treatment of prisoners."  Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017).  Thus, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference[.]"  Id.

The Third Circuit has found deliberate indifference "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."  Id. at 538.  In general, where a Plaintiff complains of "inadequate medical care," the Third Circuit has found deliberate indifference "in situations where there was 'objective evidence that [a] plaintiff had serious need for medical care,' and prison officials ignored that evidence."  Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Lanzaro, 834 F.2d at 347).

Here, Plaintiff argues that the treatment of his right-hand fracture amounted to deliberate indifference because an ortho consultation never materialized and his hand was improperly set by physicians, causing permanent damage.  Opp'n at 8–9.  Further, Plaintiff asserts that his additional medical conditions should be considered based on a "totality of the circumstances" and that the care he received for his migraines, oral sores, skin conditions, and shoulder injury demonstrates systemic deficiencies due to medical providers' deliberate indifference.  Opp'n 9–

13

10.  Because each defendant played a different role in treating Plaintiff and deliberate indifference is a subjective test, the Court will address Plaintiff's claims regarding his broken hand and other medical conditions separately and determine liability as to each defendant in turn. See, e.g., Pearson, 850 F.3d at 538.

### B. Liability Related to Plaintiff's Right-Hand Fracture

Plaintiff asserts that he was forced to wait six days before he was seen by a medical professional for his broken hand and once an x-ray was conducted, a physician assistant set his hand improperly, causing permanent disfigurement.  Opp'n at 8.  Only Defendants Tagle Manrique and Walsh were involved with treating his right-hand fracture, so the Court will evaluate the claim as to those defendants.

Plaintiff's first assertion of deliberate indifference stems from his claim that he waited six days for medical care.  It is true that "deliberate indifference can sometimes be shown when necessary medical care is delayed for non-medical reasons."  Anderson v. Bickell, 754 F. App'x 113, 116 (3d Cir. 2018).  However, there is no evidence in the record that Defendants Tagle Manrique or Walsh delayed treating Plaintiff.  The only evidence is Plaintiff's deposition testimony that he told an unidentified nurse about his injury, but was not treated for six days. According to medical records, he was seen for a sick call on May 26, 2020, by PA Tagle Manrique because his hand had been swollen for three days and he had pain at the base of his pinky finger.  SUF ¶ 37.  PA Tagle Manrique ordered ice packs and an X-ray to check for fractures.  Id.  On May 29, 2020, Plaintiff underwent an X-ray interpreted by non-party Dr. Scott Logan who found a "boxer" fracture in Plaintiff's pinky finger.  SUF ¶ 38.  PA Joe Walsh entered a note instructing that Plaintiff's cast should stay on for 4–6 weeks.  SUF ¶ 39.

At his deposition, Plaintiff stated that he received treatment "six days later" from his injury and that he would ask for treatment "every day when the nurse came" but "it was during COVID so it was very tricky." ECF 100-1 at 74:10–21. Plaintiff also stated he was "not sure" to whom he reported his injury, but that he first reported it to the corrections officer and then to the "nursing staff" but he "wouldn't have any idea who." Id. at 74:22–75:3. However, Plaintiff also stated he reported the injury to the corrections officer "right away" and that he saw a female nurse "later that day" for a medication call. Id. at 75:10–17. Plaintiff stated that he was not sure if the corrections officer informed a nurse of his injury, and because of COVID the prison did not have normal sick call, but instead "would have this nurse practitioner or PA," a woman who was "really good" and "thorough," visit "the cell and she would order the X-ray." Id. at 75:19–76:8. Plaintiff continued, "that's what I believe … happened," but "I'm not sure exactly what happened. I think she just sent me down to see the doctor … but I'm not certain of it. I can't tell you but the woman … who did those kinds of things was pretty good." Id. Plaintiff did not recall who Defendants Tagle Manrique or Walsh were by name, but knew a male physician put a cast on his hand. Id. at 78:5–22.

Based on the foregoing, there is not enough information for a reasonable juror to find that Defendants Tagle Manrique or Walsh knew of Plaintiff's injury and delayed treating it. Defendants Tagle Manrique and Walsh are not corrections officers, and they are both male. Plaintiff stated that he informed a corrections officer and a female nurse or PA of his injury initially. Thus, there is no factual basis for a reasonable juror to find that either defendant knew of Plaintiff's injury before they began treating it. It is undisputed that when Plaintiff was seen by Defendant Tagle Manrique, he was treated with ointment for a cut on his hand, provided ice, and had an x-ray scheduled. Similarly, when he was seen by Defendant Walsh his hand was placed

in a cast following his x-ray.  It is Plaintiff's burden to show that the defendants knew of "and

disregard[ed] an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  Because

Plaintiff has not made a factual showing "sufficient to establish the existence of," deliberate

indifference, "an element essential to [his] case," summary judgment is appropriate.  Celotex,

477 U.S. at 322.

Plaintiff's other argument for deliberate indifference is that Defendants Tagle Manrique

and Walsh knowingly and incorrectly set his hand despite not being orthopedic doctors.

Defendant Walsh sought advice from another practitioner before casting Plaintiff's hand because

he was unsure of the best way to do it.  After speaking with another practitioner, Defendant

Walsh placed a cast on Plaintiff's hand.  Four weeks later, when Defendant Walsh removed the

cast, Plaintiff testified that Defendant Walsh remarked that the bone did not heal properly and

placed a request for Plaintiff to visit a hand specialist.  Despite submitting the request, Plaintiff's

consultation with a hand specialist was never scheduled for six months and he was released from

prison before any consultation occurred.  The medical records do not reflect Defendant Tagle

Manrique's involvement in casting and Plaintiff stated at his deposition that he did not know

who Defendant Walsh consulted about casting.

First, there is no evidence that either defendant caused the delay in Plaintiff seeing a hand

specialist.  A non-party scheduler was responsible for organizing inmates' care from outside

providers and there is no evidence either defendant contributed to the delay.  Further, Plaintiff

has not advanced facts to suggest that defendants knowingly causing harm by casting Plaintiff's

hand.  "Where a prisoner has received some amount of medical treatment, it is difficult to

establish deliberate indifference, because prison officials are afforded considerable latitude in the

diagnosis and treatment of prisoners."  Palakovic v. Wetzel, 854 F.3d 209, 227 (3d Cir. 2017)

16

(citing <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 67 (3d Cir. 1993)).  Where there is a dispute regarding the adequacy of treatment, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  <u>Id.</u> at 228 (citation omitted).  Defendant Walsh explained at his deposition that as a physician assistant he does roughly 70 percent of what doctors do, including casting and splinting and that he had experience casting and splinting prior to his role at FCI Phoenix.  SUF ¶¶ 223, 228.  Plaintiff has not advanced facts to show Defendant Walsh was unqualified to provide casting beyond stating that he was not an orthopedic doctor and that he asked for guidance from a colleague before setting Plaintiff's hand in a cast.  This is not enough for a reasonable juror to conclude Defendant Walsh deliberately set Plaintiff's hand incorrectly.  To the extent that defendants "actually knew of a substantial risk to inmate health or safety," they are "free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  <u>Farmer</u>, 429 U.S. at 844.

Plaintiff has made no showing that it is constitutionally unreasonable for a physician assistant to perform casting or that orthopedic doctors are the only physicians qualified to perform casting.  Additionally, Plaintiff's argument that Defendant Walsh was deliberately indifferent due to the six month delay in seeing a hand specialist is unavailing.  Defendant Walsh did not have the ability to control when an outside provider could see a patient, nor was he involved in scheduling care beyond placing a consult request for approval.  ECF 99, Ex. B at 170.  Furthermore, Plaintiff's allegation about the delay in seeing a specialist was "unsupported by any evidence to show that any delay had an adverse effect on his condition."  <u>Bickel v. Miller</u>, 446 F. App'x 409, 413 (3d Cir. 2011).

Accordingly, the Court will **GRANT** summary judgment as to Plaintiff's right-hand fracture for failure to establish deliberate indifference on the part of Defendants Tagle Manrique and Walsh.

### C.  Liability Related to Plaintiff's Additional Medical Conditions

Plaintiff asks the Court to evaluate the medical care he received for his other medical conditions by considering the "totality of the circumstances," an approach that considers systemic deficiencies as evidence of deliberate indifference on the part of each defendant. Plaintiff points to three non-precedential class action suits where district courts applied the rule that "deliberate indifference may … be established 'by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" Lewis v. Cain, 701 F. Supp. 3d 361, 435 (M.D. La. 2023), vacated and remanded sub nom. Parker v. Hooper, 171 F.4th 736 (5th Cir. 2026) (quoting Braggs v. Dunn, 257 F. Supp. 3d 1171, 1251 (M.D. Ala. 2017)).  Though this is not a class action, the Court will consider whether the totality of the circumstances provides a sufficient factual basis to find that any individual defendant was being deliberately indifferent to Plaintiff's serious medical needs.  See, e.g., Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977) ("[W]hile a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures.").

Plaintiff lists the following circumstances as combined evidence of deliberate indifference: the failure to provide him with free sun lotion despite a history of melanoma, not treating him for his shoulder injury sustained at another prison facility, dismissal of his

complaints about his mouth, and inadequate migraine treatment.  Opp'n at 10–12.  Each of Plaintiff's assertions amount to disagreement with the manner of treatment, and the facts do not support a finding that any defendant had the state of mind necessary to show deliberate indifference.

### a.  Liability of Walsh

Defendant Walsh primarily treated Plaintiff's right-hand fracture, which did not amount to deliberate indifference for the reasons stated above.  There is no evidence he was deliberately indifferent to Plaintiff's other medical needs, because he neither denied treatment for those conditions nor was he involved in administering treatment.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs.").  Accordingly, the Motion is **GRANTED** as to Defendant Walsh.

### b.  Liability of DeFrangesco

Defendant CRNP Jeanne DeFrangesco saw Plaintiff for multiple sick calls throughout his incarceration involving his shoulder pain, mouth pain, and history of melanoma.  There is no evidence that CRNP DeFrangesco ever refused to treat him, but there is evidence that she refused to provide him with sun lotion.  On June 25, 2020, Plaintiff was seen by CRNP DeFrangesco and asked for sunblock due to his history of skin cancer.  CRNP DeFrangesco noted she was unable to find documentation of skin cancer in county transfer records and encouraged Plaintiff to purchase sunblock from the commissary, which Plaintiff ultimately did.

Plaintiff argues this refusal is material because "a prison official … cannot require an inmate with skin cancer to pay for their own sunblock."  Opp'n at 11.  Plaintiff relies on Benter v. Peck, 825 F. Supp. 1411 (S.D. Iowa 1993), where a district court found that prison officials violated the Eighth Amendment by withholding necessary medical treatment (prison policy

19

required the plaintiff to purchase replacement prescription glasses) for the plaintiff's diagnosed and known medical condition (nearsightedness and 20/400 vision).  However, unlike Benter, who had a diagnosed medical condition, Plaintiff did not have skin cancer.  It is undisputed that when he was released from prison, Plaintiff saw an outside dermatologist on November 30, 2020, and underwent multiple biopsies, none of which resulted in a skin cancer diagnosis. Plaintiff requested sun lotion based on having melanoma in the past.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Woloszyn, 396 F.3d at 320 (3d Cir. 2005).  Given skin cancer was not an active condition requiring treatment, Plaintiff's *history* of skin cancer was not reflected in his medical records, and Plaintiff had access to preventative measures for developing the condition such as sun lotion in the commissary, there can be no finding that CRNP DeFrangesco was deliberately indifferent to a serious medical need when she declined to provide him sun lotion.

Plaintiff argues he "was given no treatment for the shoulder injury he suffered while at" another prison prior to SCI Phoenix.  Opp'n at 11.  As to Plaintiff's shoulder pain, CRNP DeFrangesco treated Plaintiff on May 1, May 20, and August 31 of 2020 and renewed his Motrin supply each time.  Plaintiff has not advanced evidence that her treatment of his shoulder pain was outside the bounds of reasonable professional judgment.  Palakovic, 854 F.3d at 228 ("federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law").

Plaintiff argues he complained about sores in his mouth and pain in his mouth, but his complaints were dismissed and he was labeled a faker.  Opp'n at 12.  Again, Plaintiff does not state a factual basis upon which a juror could determine CRNP DeFrangesco dismissed his

20

complaints or labeled him a faker.  On May 15, 2020, CRNP DeFrangesco saw him for a sick call, discussed the sores in his mouth, and reordered Biotene, which he reported had helped relieve the sores.  She saw him for another sick call related to his mouth on August 17, 2020, when he requested increasing his Biotene prescription, which she did.  Thus, there is no evidence CRNP DeFrangesco refused to treat his mouth pain, treated it unreasonably, or labeled him a faker.

Considering the totality of the circumstances of the care CRNP DeFrangesco provided to Plaintiff, the Court finds no reasonable basis to conclude she acted with deliberate indifference to any of his serious medical needs.  Accordingly, the Motion is GRANTED as to Defendant DeFrangesco.

### c.  Liability of Bazel

Defendant Dr. Saeed Bazel treated Plaintiff on one occasion.  On July 22, 2020, Dr. Bazel treated Plaintiff "for prostate and skin conditions," and noted a small lesion on his face to the right of his nose, improving urinary symptoms, and a normal urine test.  Dr. Bazel wrote that Plaintiff should continue his present medications and noted he would consider a dermatology consult and skin lesion removal after checking with non-party Dr. Wiener.  On August 25, 2020, Bazel prepared a consult request for dermatologic telemed, noting Plaintiff was overdue for a scheduled skin consult.  The request included a note that the consultation was canceled in January of 2021 by a non-party doctor due to patient release from prison.

As with CRNP DeFrangesco, Dr. Bazel did not ignore Plaintiff's medical needs.  He responded to Plaintiff's sick call request, performed an examination, consulted with another physician, prescribed a course of action, and ordered a follow-up consultation.  Any delay in scheduling an outside dermatology consult was not due to Dr. Bazel's conduct and even if he

21

were responsible for the delay, Plaintiff failed to adduce evidence that Dr. Bazel knew of facts from which the inference could be drawn a substantial risk of serious harm existed from the delay. There is no factual basis that Dr. Bazel should have known skin cancer was developing because there are no facts suggesting Plaintiff had skin cancer at the time or at any point in prison. See, e.g., Charleston v. Corizon Health, Inc., No. CV 17-3039, 2018 WL 1757606, *13 (E.D. Pa. Apr. 12, 2018). To the extent Plaintiff complains that Dr. Bazel's treatment plan was wrong or even negligent, that is a question of professional judgment that does not rise to deliberate indifference. Accordingly, the Motion is **GRANTED** as to Defendant Bazel.

### d.  Liability of Kaminsky

Defendant PA Stephen Kaminsky treated Plaintiff for several sick calls. On April 7, 2020, PA Kaminsky ordered a phenobarbital level to test the level of phenobarbital in Plaintiff's system. April 8, 2020, PA Kaminsky treated Plaintiff for a sick call, where he described his tongue as feeling like it was burning. PA Kaminsky evaluated him and decided to increase his omeprazole prescription for 30 days and reevaluate. On July 24, 2020, PA Kaminsky treated Plaintiff for complaints of pain and swelling from his fractured hand. PA Kaminsky noted he "will request ortho hand consult." PA Kaminsky placed the request on July 30, 2020, and it was approved by non-party Dr. Leclerc on July 31, 2020.

Again here, PA Kaminsky never refused to examine Plaintiff. As to his dental condition, Plaintiff does not assert any factual basis on which to conclude that PA Kaminsky knew of a substantial risk that he had Sjogren's Syndrome and PA Kaminsky ignored that risk. Plaintiff had been treated by a dentist and there is no evidence to suggest that PA Kaminsky had reason to question the dentist's course of treatment, nor are there facts to suggest that PA Kaminsky's decision to increase Plaintiff's existing omeprazole prescription was outside the bounds of

22

professional judgment.  Similarly, PA Kaminsky's decision to request an orthopedic consultation as a follow up for Plaintiff's complaints about pain in his fractured hand was within reasonable professional judgment and there is no evidence that PA Kaminsky caused a delay in Plaintiff's ability to see an outside provider or had the power to schedule it sooner.  Thus, there is no basis to find PA Kaminsky was deliberately indifferent to Plaintiff's serious medical need and Motion is **GRANTED** as to Defendant Kaminsky.

### e.  Liability of Wakeman

Defendant CRNP Anna Wakeman treated Plaintiff's shoulder pain, migraines, and dental condition.  On March 18, 2020, Plaintiff was seen by CRNP Wakeman for a sick call due to pain in his right shoulder from his injury at his prior prison as well as low back pain that traveled down his legs causing numbness.  CRNP Wakeman examined him and prescribed Robaxin/Motrin and made a note to consider physical therapy.  Plaintiff has failed to adduce evidence that CRNP Wakeman ignored his pain or that she had reason to believe her treatment was outside the bounds of professional judgment.

As to Plaintiff's migraines, on July 19, 2020, Plaintiff complained to a non-party nurse that he was not receiving Imitrex, the medication he needed for his migraines.  The nurse told him they did not have it right now and they were waiting on the pharmacy for refill.  On July 22, 2020, CRNP Wakeman treated him for a sick call because he hadn't had access to his headache medication.  CRNP Wakeman changed the order to another pharmacy.

At his deposition, Plaintiff explained that he "thought [the staff was] being mean to [him] and just denying [him] the medication," but he later realized that he was only given the pill for seven out of 21 days to avoid his body getting used to the medication.  He testified that he does not believe any individual defendant maliciously withheld medication for his migraines.  SUF

¶ 130; see also Opp'n Resp. to SOF at 7, ¶ 130.  Plaintiff's argument that he "was not given a second medicine to supplement the Imitrex," reflects a disagreement as to "the propriety or adequacy of a particular course of treatment … [which] remains a question of sound professional judgment."  Palakovic, 854 F.3d at 227–28.  Further, there is no evidence that CRNP Wakeman had the requisite state of mind of denying Plaintiff treatment for his headaches because the records reflects that she sought to get his medication faster, and Plaintiff himself stated that he did not think any individual defendant maliciously withheld his medication.  Therefore, Plaintiff has not adduced facts to suggest CRNP Wakeman was deliberately indifferent to his chronic migraines.

Finally, CRNP Wakeman treated Plaintiff for a sick call on August 12, 2020, due to painful lesions under his tongue.  CRNP Wakeman noted his oral candidiasis had resolved but he should continue Biotene for the lesions that persisted on his tongue, and she indicated following up to consult with Dr. Wiener about the lesions.  She also noted that Plaintiff was in line for a dental follow-up.  Here again, CRNP Wakeman examined Plaintiff, identified medication to treat the ailment, and flagged the issue for follow up with another provider.  The record does not reflect that CRNP Wakeman ignored Plaintiff or refused to treat him, nor is there evidence that treating the lesions with Biotene, consistent with dentist recommendations, was outside the scope of reasonable professional judgment.  As such, Plaintiff has not established facts to support deliberate indifference, and the Motion is GRANTED as to Defendant Wakeman.

### f. Liability of Tagle Manrique

Defendant PA Oswaldo Tagle Manrique treated Plaintiff for his right-hand fracture and various other medical concerns.  On April 14, 2020, Plaintiff saw PA Tagle Manrique for a sick call and requested a renewal of Motrin for his right shoulder pain, which PA Tagle Manrique

24

provided.  He treated Plaintiff on May 23, 2020, when Plaintiff came in with his right-hand injury and PA Tagle Manrique ordered an x-ray, Motrin, ice-packs and band-aids.  On June 17, 2020, PA Tagle Manrique treated Plaintiff by giving him an administrative exam and took note of Plaintiff's history of seizures, chronic shoulder pain, migraines, and removal of melanoma in 2019 and determined Plaintiff was "medically stable."  On June 19, 2020, Plaintiff saw PA Tagle Manrique for a sick call complaining that he had not received his migraine medication and his chronic shoulder pain remained a problem.  PA Tagle Manrique noted that "Imitrex 25 mg [twice per day] was prescribed … by another provider but not approved. Will re-prescribed Imitrex 25 mg … pending approval. Renewed Motrin prn for chronic R shoulder pain. Requested MRI report of R shoulder, authorization signed and submitted."  On June 24, 2020, non-party LPN Samantha Thomas confirmed he was given Imitrex.

The record indicates PA Tagle Manrique responded to Plaintiff's sick call requests, performed examinations, ordered diagnostic tests, prescribed medication, and ordered follow up. PA Tagle Manrique did not ignore Plaintiff's medical ailments and there is no evidence the care he provided was outside the bounds of reasonable professional judgment, which is necessary to show he had state of mind underlying deliberate indifference.  Johnson, 737 Fed. App'x. at 612. As such, no reasonable juror could find Defendant Tagle Manrique acted with deliberate indifference to Plaintiff's serious medical needs and the Motion is **GRANTED** as to Defendant Purnavel

### g.  Liability of Purnavel

Defendant CRNP Paula Purnavel treated Plaintiff on three occasions.  On March 24, 2020, CRNP Purnavel treated Plaintiff for a sick call where he complained of jock itch, foot fungus, and whole-body eczema.  She prescribed Triamcinolone cream for his rash, Aquaphor

ointment, and Ketoconazole for the inguinal and feet areas, and instructed Plaintiff to avoid moisture.  She treated him again on April 28, 2020, for a sick call related to his mouth sores.  CRNP Purnavel prescribed Biotene mouth wash and short-term prednisone, and ordered follow up if no improvement.  Finally, on August 3, 2020, she treated Plaintiff for a sick call due to his shoulder pain.  She examined him and noted his MRI showed rotator cuff lesions and he had a slightly limited range of motion.  She also observed oral ulcerations and oral white plaque, which she indicated aligned with stomatitis and oral candidiasis.  As a result of the examination, CRNP Purnavel increased Plaintiff's Pamelor prescription to 50 mg, prescribed Biotene for oral lesions, prescribed Diflucan for 7 days, and follow up on sick call if no improvement.  She also noted they were waiting on his ortho consult for further recommendations as to his shoulder.

The record indicates CRNP Purnavel consistently responded to Plaintiff's sick call requests, performed examinations, consulted his medical history and diagnostic tests, prescribed medication, and ordered follow up.  At no point did CRNP Purnavel refuse to provide treatment and Plaintiff has failed to support his challenge to the adequacy of care with facts showing she acted outside the bounds of professional judgment with knowledge that there was a substantial risk of serious harm due to her course of treatment.  Charleston v. Corizon Health, Inc., No. CV 17-3039, 2018 WL 1757606, *14 (E.D. Pa. Apr. 12, 2018) (holding that medical staff's failure to recognize, diagnose, and treat inmate's cancer may have been negligent, but did not amount to deliberate indifference because they did administer treatment when sought and there was not evidence they were aware of a substantial risk of serious harm and ignored the risk).  As such, no reasonable juror could find Defendant Purnavel acted with deliberate indifference to Plaintiff's serious medical needs and the Motion is **GRANTED** as to Defendant Purnavel.

### h. Totality of the Treatment

Even looking holistically at the full history of Plaintiff's medical treatment, the record reflects that whenever a defendant medical provider became aware of Plaintiff's complaints of pain, even if the complaints did not arise to a serious medical condition, they examined him, prescribed additional doses of medication or follow-up, and consulted with each other to coordinate his care. Plaintiff "may have disagreed with the specific medications he received, but deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment, which remains a question of sound professional judgment." Johnson v. Caputo, 737 F. App'x 606, 612 (3d Cir. 2018) (cleaned up) (quoting Palakovic, 854 F.3d at 227–28). There is no evidence that any defendant was aware of a serious risk of harm to Plaintiff and deliberately ignored that risk.

### V.    CONCLUSION

For the foregoing reasons, SCIP Defendants' Motion for Summary Judgment (ECF 94) is GRANTED.[2] An appropriate order follows.

---

[2] The Court previously issued an Order (ECF 105) granting in part and denying in part a Motion for Summary Judgment related to Plaintiff's claims against a separate group of defendants who worked at George W. Hill Facility ("GWH") where Plaintiff was incarcerated prior to SCI Phoenix. The Court granted summary judgment as to the individual defendants affiliated with GWH, but denied summary judgment as to the institutional defendants. A motion for reconsideration (ECF 107) is pending.